Third case, United States v. Simon Ms. Pollack May it please the Court, and Mr. Walters, Elizabeth Pollack on behalf of Mr. Simon from the Federal Defenders for the Central District of Illinois. There's a lot of issues to talk about in this brief, first time getting 15 minutes from the panel, so I'd like to start with the issue of the credibility of the police officers, and if there's anything else that the Court would like to ask you, please do so and we'll move on to that issue. I don't think it's hyperbolic to say that if the district court's ruling on the credibility of these officers is allowed to stand, that it will stand for the premise that a police officer be found incredible as a witness. These officers, now usually it's commonly known when a police officer gets up and testifies, you have to try to impeach their credibility if you think they're not telling the truth. The means with which you have to do that is limited. Usually it's, oh, you said something different than your police report, or are you sure you really remember? Wasn't it dark outside? That's what your normal impeachment of a police officer looks like, and it's not often successful. That is not what happened in this case. We had multiple falsehoods and mistakes of extreme significance that the district court ignored or talked his way around in a way that is, frankly, difficult to comprehend. The whole issue of the traffic stop in this case was, could the officers have seen and judged 100 feet, because that is the distance with which you're required to signal under Illinois vehicle code before you make a turn. They could not tell the difference between half of the football field and two football fields. They were hidden and secreted away in the dark behind a propane tank, and they said that is 75 yards from the intersection. It was not. It was double that, and yet their credibility with regards to the ability to judge distance was upheld. Then you have the issue of, there's just so many of them. My reply brief lists out the things that were so inconsistent among all the testimony of the officers in this case. One of the officers answered on cross, well, she couldn't see the stop sign in the photo, but she knows it's there because she has great night vision. There was never a stop sign at that intersection, and she said there was. Then they said they saw the car coming from five blocks away. The photographs were admitted into evidence. You can't see it. You literally cannot see that far, and yet they said they could. They said that Mr. Simon admitted to smoking marijuana, but he didn't because I watched every second of dash cam video and every second of his interview at the police station, and the only thing he did was deny smoking marijuana, that he never admitted it, and his drug tests from the U.S. probation office prove it. It was negative. They said that the female officer, Jamie Hagemeyer, wrote the ticket. Now, this is, I think, the most disturbing piece of this to me because I cross-examined her, and I said, did you write the ticket? Yes. What did you write? Date of birth? Yes. Address? Yes. She didn't say, I was processing the ticket by running his information. She said she wrote the ticket, and she lied. The fact that it was elicited on cross-examination is irrelevant. What does that mean? That if a police officer commits perjury on cross, it's not the same as if they commit it under direct? She said it. She lied, and the district court's reasoning for finding her credible, even in spite of that blatant falsehood was that she might have been mistaken, and maybe she didn't remember. Well, what evidence is there of that? These people were on dash cam video, which was presented to them during the hearing for them to watch. They watched it before they went in. They prepped with the U.S. attorney. They did not forget what happened during this traffic stop. They know exactly what happened. And that is just the biggest pieces of testimony that were utterly impeached by me with direct evidence during this hearing and after. So I know that the standard is difficult. I don't disagree with that. It's a clear error standard, but clear error does not mean never error. I understand the wanting to believe that the police officers who testify before our courts are telling the truth, because if you think that they don't, that opens up a can of worms that is terrible, and you don't want to think it. But if it's right in front of you, and it's clear, you have to do the right thing. And that is not what happened here with that credibility finding. Everything else in this case hinges on that credibility finding, because when the district court found those officers to be credible, and he believed that there was probable cause for the traffic stop, that was wrong. When he believed that they did not delay the traffic stop for the canine to arrive, that was based on credibility. Everything about the case, except for the part where I challenged the reliability of the canine, is about the officer's credibility, and they don't have any. So the first position that I take in this case is that the motion to suppress, the ruling, needs to be reversed. These officers were simply incredible. They told lies that were disproven with actual hard pieces of evidence, which I have to admit has never happened to me before. I have never had the opportunity to actually show a falsehood with that level of reliability and hard evidence, but it was there. And still they were found credible. So just as an initial matter, it should be reversed. The motion should have been granted. Those officers were not credible. There is no indication that there was probable cause to pull his vehicle over in the first place. Everything else should be excluded and the case should be dismissed. That is the first argument. Now with regards to the training of the canine, I know a lot about dogs now that I never knew before after this case, but the way in which the Macon County Sheriff's Canine Training Academy teaches their animals to smell odor, not drugs. That is a ticket that is being written for any police officer with a canine in any circumstances whatsoever to get into any car, any house, or any person's pockets that they want, whenever. Because those dogs are being trained to smell the absence of something. And when a dog is tested and certified through the Illinois authorities, the testing amounts are in multiple grams. Usually if you look at the canine training records that are in the record here, it's 11 grams, 28 grams, 111 grams. They certify, they test them to see whether they can sniff huge amounts of drugs. The reason why SWGDOG, the National Certified Body, recommends training on actual one gram or five gram substances is because the whole purpose of a canine sniff is to give you probable cause to find something. If a canine alerts on a car or at the front door of a home, that's probable cause to search the car and get a search warrant to search the home, meaning you expect to find something there. That probable cause is a low standard. It's a low standard, but you still, it has to be expected that there's something in there. I mean, you don't search someone if you don't expect to find them. If I smell marijuana, if I'm a cop and I smell marijuana, then that odor, even if somebody had been, you know, I got in an Uber a few weeks ago and it seemed pretty clear that the Uber driver may have been smoking marijuana in the car before. That doesn't mean the marijuana was still present in the car. That's correct. The odor was there. If I were a police officer and I smelled that odor, I think that would be probable cause to search the car. I think you're absolutely correct about that. But here's the thing. We use canines to sniff things that humans can't smell. If a police officer rolls up and smoke pours out of the window or it just smells strongly of that odor of marijuana, absolutely, that's something that you don't need an expert for that. You need special training for that. Anybody can smell marijuana. That's fine. The dogs are used to smell things that police officers can't smell. The dogs are used to establish the probable cause that the police officers can't establish without the dog. And those dogs, it is a science training an olfactory sense in an animal to specifically alert to pursue into a specific command that they locate something particular in that area. That is a science. It requires expert training. It requires certification. There are standards that are recommended for that to occur. There's no standard for a police officer to, I mean, I assume at the academy they're handed bags of drugs and, you know, this is marijuana, smell it, and they know it for the foreseeable future. But what about this language in Harris that says, in the usual case, the mere chance that a substance might no longer be at the location does not matter. A well-trained dog's alert establishes a fair probability, all that's required for probable cause. Because Harris had nothing to do with the training of that animal. Harris had to do with the fact that that dog had passed a test. And that the Supreme Court, that the Florida law that was overruled in Harris required this really rigorous set of standards and evidence in order for a dog's alert to be preserved. And they're like, no, no, you can't do that. That is completely separate from what is happening here in this case. Because there was no evidence in Florida versus Harris. I mean, sure, a dog probably can smell residual odor. They have good noses. That's why they're used as canines, because they have a better ability than humans to do that. But what you cannot do is train an animal, because really what it comes down to is if you train a dog to alert to nothing, to alert to a smell, you can never know if that dog is really alerting to a smell or if he's alerting to something else. One of the issues that Dr. Cable found in this case as our expert was that the dog alerted repeatedly to door seams on vehicles, even when there was nothing there. And that was a lot of what his errors were in his training, was he would alert to door seams. What did you smell? A door what? A door seam on a car, the seam of the door where it meets the car. And because they had stuffed cotton balls that had been sitting in a jar with drugs. And so he was alerting, they say, to those cotton balls. But there's no way to test that. There's no way to prove it. There's no way to know if he's in the field, if he's alerting to a door seam, because he's used to alerting to door seams. So is he like an 85 or 86% success rate? Depending. So in training, that's correct, but it totally depends on how you measure the training. Because in this case, what they did was when he had what they call, I would call a false alert, meaning that he alerted to something when nothing was there. That if you look at his actual performance in real traffic stops, it's funny the way they work this, because he'll alert, the dog will bark or lay down or whatever he does, and then they won't find anything, like what happened here. And if you review the testimony of Detective Larner, who is the trainer of the Macon County Sheriff's Canine Training Academy, they then try to retroactively create that positive alert. So they never believe their dog is wrong. If the dog doesn't find something, they're like, oh, well, it must've be residual odor. And then they go and talk to the person, and it's like, have you been in a house in the last week where somebody smoked marijuana? Oh, yeah, somebody was around, okay, that's it. That's what he was alerting to. So you can't accurately judge the recordings of whether or not this dog is right or wrong, because they retroactively go back and try to make him right in every single case, exactly like they did here, where they said, Mr. Simon admitted to smoking marijuana. No, he didn't. Mr. Simon's wallet smelled of marijuana. Okay, I don't really know if that's true or not, but what I can say is that on the dash cam video, you can see Detective Danner hold the wallet up like this to his face and look in it, and then gave it back. And then at the police station, he didn't smell anything, by the way, not on the dash cam video. It was only at the station, an hour later, when he opened it and go, oh my God, the marijuana. I can't breathe. It's so strong. The odor of raw cannabis. So he testified that he smelled that, but if you look at Officer Hoker leaning in the window, looking at the wallet, and then you look at Officer Danner looking at the wallet, nobody smells anything. There's no marijuana in that wallet. There was nothing in there. That's just the way that they get to confirm that the dog alerted, because if the dog doesn't find anything, or if you don't find anything pursuant to an alert, then, well, the dog has to be right, because, you know, he alerted. That's how they do it. And it's just ridiculous that they're able to pad their statistics in that way by trying to take circumstances surrounding the actual person in the vehicle and then look back and say, okay, well, this guy said he smoked three hours ago, or this guy said, yeah, my cousin was riding in my car, and so he must have put something in there. I mean, the varied excuses that they come up with for why the dog would alert and nothing is found, it's shocking how much that happens. So their statistics are great, because they think their dog is perfect, or they're trying to make him perfect. I don't think the language in Florida v. Harris means that you can train a canine to alert to nothing and then use that canine anytime you want, a free pass to get into any vehicle, any house, anything you want, because that's not what Harris stands for. Harris stands for, yes, a dog is probably capable of smelling residual odor. There's no indication, yes or no, that maybe they didn't smell that residual odor, but you can't train the dog to alert to nothing, and that's the problem here. I see I'm into my rebuttal time. I'll take a seat for a moment. I have one question. Yes. This is a recusal. Yes. I mean, you make a big deal of it when you breathe. I do. I told you I didn't have time to address every issue I thought, but if the court would like, I will address that now. Well, I don't care when you address it, but I think since you've raised it, I'm curious about it. Okay. Well, I will, if the court would allow me just one minute for rebuttal. I'll give you some additional rebuttal time, so you should answer judgment. Thank you. With regards to the recusal, when this case was filed, there was a revocation petition that was filed simultaneously. The conduct at issue was Mr. Simon was on supervised release. They filed a revocation petition. They also filed this new case. The revocation, the district court was recused from hearing, and the reason that was is because the district court was then the first assistant U.S. attorney during that prior case, and the appearance of impropriety was such that the practice was that for any revocation case that came up before the court that had been pending or under investigation at the time that the court was working as the U.S. attorney's office, he did not hear those cases. This case, though, the district court retained and kept, and, you know, we raised this at the time in front of the court. He didn't think it was worth anything, and so he denied the motion. We elected to proceed directly to the motion to suppress instead of doing a mandamus petition or a mandamus writ, but regardless, the issue really is just the appearance of impropriety. We're not saying that he had anything to do with that case or anything to do with Mr. Simon's charges. He was just the supervisor at the time, but he reviewed plea agreements. He signed off on office policy. He dictated the policies of the criminal division, and so it looks bad when a judge is working for the prosecutor who prosecutes a defendant, and then that defendant later comes before that prosecutor as a judge. It just doesn't look right, which is, I believe, why there was the automatic recusal of the supervision case. Well, it seems to me, though, there's so much that goes on, so many people. He said he didn't recall it. He said he didn't recall it, but, Your Honor, I think there's a difference between the size of the central district and the size of this district, for example. I mean, there's not that many of us. I am the only trial attorney in the Urbana division. There are, I believe, four assistant U.S. attorneys who handle criminal cases. There's civil people. I mean, the numbers are just not that large, so whether or not ... It's different than if you had 200 assistant U.S. attorneys and there was one supervisor overall, 200 in a bigger district. That's not the case here, but regardless, even if he didn't have any knowledge of it, that's not the question. The question is, does it look bad to a normal person looking from the outside at this case? Does it look bad that the person who supervised your prosecution is now your judge? And I think the answer to that is unequivocally yes. It looks bad. Now, does that mean that it affected his decision making in any way? I have absolutely no idea. I have no basis to assert that. I have not asserted that. What I'm saying is that it looks bad when you previously were overseeing a defendant's prosecution and now are his judge. So this is about the fact that he supervised a prosecution, not that that prosecution happened to yield the felony that was then the subject of the Felony Possession Charge addition. We asked both. We alleged both in the motion. One alternative was just the 455A impropriety just on the face. The other one that we argued in front of the district court was that that exact case led to the enhancement under 18 U.S.C. 924E here. We did not assert that on appeal, and I haven't. So I believe that just the flat appearance of impropriety, the way that it looks, the way that it just tickles the skin wrong when you look at a judge who supervised a prosecution and now is judging that same defendant, that's the basis on which we have appealed. Any further questions, Your Honors? Thank you. Thank you, Ms. Pollack. Mr. Walters. May it please the Court, Ms. Pollack. I'll start with the recusal issue first since my colleague ended with it and Judge Manning had just asked about it. I think there is a distinct difference between the judge presiding over a revocation of supervised release proceeding from a criminal case that was initiated when he was the first assistant versus his presiding over a criminal case commenced years after he becomes a district judge that was not investigated until years after he became a district judge. So I think that's the distinction as to why as a matter of standard policy within our district that he is recused from matters that were under his supervision and that 2011 case was. So whether that would have been an appearance of impropriety under 455A or possibly under 455B3 because of some tangential involvement in a case that was then occurred within our district because supervised release revocation is just a continuation of that prior case. We're talking here of an entirely different matter. To answer your question, Judge Baird, I understood you asking my friend that did it matter that the conviction used in the indictment, the status element, should have that caused him to have recused himself. That issue was not raised below, was not raised on appeal. I don't think it was caught by anybody. So I would argue that that argument was waived because it wasn't raised. The argument that was raised below and continues on appeal is that crime from the 2011 conviction caused him to become an armed career criminal or was one of the three convictions. And in their opening brief of the defense, the sole argument they make is relying on United States against Herrera Valdez. I think our case is really materially distinguishable between what happened in Herrera Valdez and because it comes down to the fact that in Herrera Valdez, the linchpin, this court said, of that defendant's defense was a collateral attack on his prior removal. Here there was no opportunity, there was no basis. In fact, they could not have collaterally attacked the 2011 conviction that served as a basis for the enhanced sentence. You can go on to your other. So addressing head on the argument about credibility. First I'd like to make a correction of my colleague when she said that the officers testified that this defendant admitted to smoking marijuana. That was not officer testimony. What happened is the court would look at the government's responsive brief in the district court. Government counsel noted in footnote two of record 14 that assertion arguing that Mr. Simon had admitted to smoking marijuana. However, counsel asked two officers, Officer Hagemeyer, Officer Snyder, transcript two, page 98, and then transcript two, page 163, did he admit to you that he smoked marijuana? Both officers said no. So government counsel made an incorrect assertion in his brief, but I did not find any testimony where they were asked, did he admit to you that he smoked marijuana, and they said yes. In fact, they said no. Again transcript two, page 163. I think the most problematic testimony, and I agree with my colleague, the testimony from Officer Hagemeyer that said, I wrote the warning. Officers can be incorrect without, as my colleague says, lying. I think the judge, and this is why this court has said, it can virtually never be clear error, particularly when the preponderance of the evidence is the standard. It can virtually never be clear error on credibility findings unless it's against the law of nature or an impossibility. And he evaluated that. If you look at pages 15 and 16 of his order, or it's on, I'm sorry, appendix pages 15 and 16, talking about, I did not see an intent to deceive. She could have been mistaken. And having heard the entirety of her testimony, in the entirety of Officer Danner's testimony, he found the officers overall credible. And he also addressed specifically this notion that just because she is incorrect, and we agree, I think looking at the handwriting, there's no argument that she didn't write the ticket. But it's also based on the premise that, the argument that because she didn't write the ticket, that means they did absolutely nothing during the approximately two minutes and 49 seconds that she's in Officer Welge's car processing the ticket. That is a very short amount of time to be able to completely process a ticket through even finalizing the written warning or citation. So if we look at the sequence of events, within four minutes and one second, they've ran the criminal history, they've been up to the car, and it's now time to process the ticket. That's within four minutes and one second. Two minutes, just a little bit over two minutes more, less than two minutes more, the dog has arrived. And within a total of six minutes and 50 seconds, nearly double the time, or less than half the time that Ms. Pollack was arguing, the dog had arrived, the dog had alerted. In Rodriguez versus United States, the Supreme Court said the seizure, the authority for a seizure ends when the task tied to the traffic infractions are, or reasonably should have been, completed. And it would be speed of light, speaking somewhat hyperbolically, for a traffic infraction from the point of inception to completion to be done within six minutes and 50 seconds. And yet we have the dog alerting within that amount of time. And we suggest under the touchstone of the Fourth Amendment, which is reasonableness, that this is a reasonable duration. In fact, it would have been a very short duration had the entire traffic stop been done within six minutes and 50 seconds. And so, granted, we do have the credibility issue, which the judge addressed. And he's in the best position to address that, given his opportunity to hear the testimony, to observe the witness's demeanor. The other problematic point that my friend points out is the distance. I suggest it's not two football fields, I won't quibble. 145 yards versus 75 yards. Their estimate was off of how far away they were from that intersection. But they didn't describe it just in terms of distance from the intersection of when he made the turn. They estimated one and a half car lengths, two car lengths, 20 to 30 feet. All of those are distant estimates. But Officer Danner also testified that the use of the turn signal was almost contemporaneous with the turn, and that the headlights of the car were illuminating that intersection at the time he used his turn signal. And the rule of thumb being approximately 50 feet for the headlights to directly illuminate in front of a car. So using those estimates, and again, as you said, Judge Barrett, in different contexts, but probable cause is not a high standard. We're talking about facts, a reasonable probability that a car committed, or that the driver of the car committed a traffic infraction. Would it have been impossible for them to see from behind the propane tank at the 145 yards? No, it was a clear view. And in fact, the impossibility that my friend had argued below was the impossibility of seeing a car five blocks away, its headlights driving towards that intersection. That was the impossibility argument that was made in her brief below, as far as the ability to see an intersection that's 145 yards away. I don't understand that argument. I think the argument now is, well, it's impossible to have judged 100 feet from that position, and I don't know how, absent just saying it's impossible, how you can say that's impossible, particularly given the visual cues that Officer Danner testified, or the visual description, not just distance-wise, but almost contemporaneous with, and headlights illuminating the intersection at the time the turn signal was used. So I see those as being the two critical credibility issues, that we were wrong about the distance, but notably, they said where they stood. I mean, there's no inaccuracy. They said we're behind the propane tank. They just judged the distance from the propane tank to that intersection incorrectly. That's not a lie. And then we have the other thing dealing with, did Officer Hagemeyer write the ticket? And no, she didn't. She was wrong. But that doesn't mean, as the court said, that though she might not have written the ticket, that there was absolutely nothing else being done. There's more to a ticket process than putting pen to paper. And again, I suggest that short amount of time, from approximately four minutes and one second into the stop, when she went to Officer Welges' car, to when the alert happened, that that is a very quick time to get an entire ticket processed. Do you want to address this training the dog? I do. Thank you. So a number of things. It's interesting, this part, that when you asked about Judge Barrett the 86% accuracy, 24%, those are her experts' numbers based on training. And looking at a specific area of alerting on cars at training. She looked at those numbers and said, well, he has an 80% find rate and up to a 24% false alert rate. But even if we took her experts' numbers in training, that would show that this dog is reliable for a constitutional purpose. That again, we're talking about a fair probability. And even with a high false alert rate, according to their expert of 24%, that means 76% of the time, when he alerts, that there are going to be drugs present. And the field record argument, Harris did address this. It's a problem that's why they said that the training records, the controlled environment, is the gold standard because of the problem with field records. Two problems with them. Number one, it's going to under-report false negatives, meaning misses. We don't know if a dog does an alert, whether he missed something or she missed something or not. On the other hand, when a dog does alert and there's nothing in there, the court in Harris said it's going to significantly overstate false positives. Why? Because there are a number of options. One, the dog could have very well been mistaken. Number two, during the search they missed something. Or number three, a dog alerts to odor and not the presence of the actual drug. And so you have the possibility of alerting to residual odor. So that's the problem with relying on field records. So the court says what we do is we take a presumption that the alert of a canine, a court may presume that the alert of a canine establishes probable cause if trained by a bona fide organization in a controlled setting has been certified. And that's what we have here with Rex in April of 2016. Having been certified after searching a total of 196 items or areas that had 11 total finds. And so an opportunity to have a number of false positives. And during that particular certification he had no false positives. And so that's how you can take confidence at least from the certification standard is that when there are opportunities for the dog to fail an alert out of 196 items that leaves 179 that have nothing in them and he doesn't alert. I think we can take confidence this dog is well trained. Now they have an opportunity to rebut that based on faulty methodology and training or too lax in the standards. And what the argument came down to below was the difference between scented cotton balls or what SWGDOG, which is not a national certifying body, says you can train on only no less than one gram. So cotton balls versus one gram. And I will tell you the absolute record is the difference between those two. I don't understand cotton balls. What is it? Is it something wrapped in cotton? They'll take cotton balls and put them in a jar with controlled substances overnight or for a period of time for the cotton ball to absorb the scent of the drugs and then use the cotton ball at times in training. It wasn't invariable that they used cotton balls in training, but it did happen. But SWG, the scientific working group, I see I'm out of time if I could complete. No, you can continue. The scientific working group recommends that you use no less than one gram in training. And the concern is that we don't want to oversensitize a dog to only alert to residual odors. But there's nothing materially, at least from the record, materially distinct between using a cotton ball that's been scented overnight or for days versus one gram in training for the dog to alert to. And we just don't believe that it would be permissible to draw a line in constitutional law between a scented cotton ball and one gram of drugs for training. Is it routine to keep statistics on a dog? Do we? Yeah, yeah. About as time goes on, maybe they get better, maybe they get worse, I don't know. Well, I think there are two things, Judge Manning, that happen. There's annual certification or recertification that's mandated by the state of Illinois. Oh, okay. And then on top of that, there are four to eight hours, depending on if it's a single-purpose dog, meaning narcotics only, or dual-purpose. There are four to eight hours per week of training for the dogs. And so they keep records. So it's always current then? Hopefully, if they're doing their job and keeping the records, yes. Thank you, Senators. Thank you, Your Honors. Ms. Pollack, you may have three minutes. Thank you. I do want to acknowledge Mr. Walter's point about the statement about whether or not they smelled marijuana. It is in the government's brief at the district court level. It states in footnote two of record number 14 on the docket, the defendant admitted to the officers that he and his girlfriend used marijuana and therefore drugs had recently been inside the vehicle, hence the lingering odor. But unless I misunderstood the government's argument, I thought he conceded that it was misstated in the brief. Mr. Walter's conceded that, yes, that's correct. But in fact, the officers had not said that. That's correct. That was an error. They must have told that to the government prior to the filing of the motion, but it was not stated at the hearing. So that was a mistake on my part, and I apologize. With regards to just... There's a lot of jumping around to do. The credibility standard having to do with whether or not it's impossible, physically impossible for the officers to have seen what occurred. I put a little bit of math in my reply brief. I'm not great at it, but contemporaneous with, you know, a car traveling 35 miles an hour is going to cover 100 feet in two seconds. So is two seconds contemporaneous? What's less than two seconds? How did Officer Dader judge that? I think it's problematic to say that contemporaneous is not... It could be 100 feet from what he was saying. Also, this brings up an issue that was not discussed by either of us, which has to do with the supplemental motion that I filed, the video that I wanted to present to the court, because the video that I took, it was after the conclusion of the evidence. I asked the court to allow me to present it, and the court said no. That video was taken at the propane tank at the same time of night as the alleged traffic fence, and shows actually my investigator driving from the exact point Mr. Simon was located to the exact point of the intersection. And that video would have shown that it was impossible to tell, because we had him do multiple runs with the turn signal activated, and we measured where 100 feet was located, had him activate at a... It was a fence post to show that you just can't see it. It's impossible to see it. And I was not allowed to present that evidence in front of the district court. He said it would not affect his credibility finding at all. And so I didn't get to. And if there is any issue that this court decides, if there's not enough to reverse the motion just based on the findings, then at least give me the chance to present all that evidence. But why didn't you do it at the hearing? Because I hadn't taken the video yet at the hearing. So the video, the way that this motion was argued, it was over a period of four months. We had four different dates that we argued. The first date, that was in July of 2017, and that was all about the dog's nose. Then the second date, or actually it was two dates in July. And then we waited until September to argue with that... Goodness, I can't even remember what the dates were, but basically it was spread out over a long period of time. And it wasn't until after I heard the officers testify at their hearing that I realized, oh my gosh, I think they're lying. And then I did an investigation where I got the tickets and I was able to show and present through my investigator about the distances were wrong, everything was wrong, the picture showed it, the ticket showed she didn't write it. And frankly, Your Honor, I thought that was enough. I thought it was enough. We had shown that there were multiple misstatements, confused testimony, false testimony. I didn't think I needed it. And when I saw the court's order, I thought, this is impossible. How could he have believed them? And so then I went out to try to further my client's case because he shouldn't be in custody right now. That's my position. Why would a motion suppress take so long? Scheduling. Scheduling on a motion to suppress over many months? How often does that occur in the district? I mean, a motion to suppress is generally a pretty compact. It was. Well, if I remember correctly, Your Honor, the first day my expert showed up was on July 10, 2017. The court had given us two hours. She took all two hours. Then the next available time was in, I think it was two days later, and that was the officers. And we only had an afternoon. And then the government requested to put on additional evidence. And that took time to, we had, at that point, we had to gather additional evidence. And so we asked for a brief period of time in which to accomplish that task. And we were set for September. So that's, I guess, how that worked. It was the court's scheduling. We didn't have any full days available. In conclusion. It just seems to me that, just as a practice, memories don't necessarily get better in these situations. You're focusing, appropriately, on inconsistencies or inaccuracies, or in your case, you think falsehoods. That it's surprising in a relatively small district that you would take that long to segregate hearing dates on a motion. It's difficult for the parties, difficult for the judge, I'm sure. I don't disagree, Your Honor. And I have no idea why that occurred. If I can just make one more brief point. You may. Thank you. With regard to the Rodriguez issue, which I didn't have a chance to even address, Mr. Walters is correct. The length of the stop was incredibly short, which is why I cited to those Illinois cases in the brief, which recognized that four and a half minutes to six minutes to eight minutes is a reasonable time for any traffic stop. I personally had that experience last week. Took three and a half minutes, I actually measured, to get a ticket for speeding on the highway. In terms of whether or not Rodriguez is implicated by that brief period of time, the government's brief, the evidence was that Officer Hagelmeyer was in the car checking stuff. Like maybe she wasn't writing the ticket, but she was checking stuff, including the VIN number. Well, nobody ever asked for the VIN number. Nobody ever checked for the VIN number. There's no spot for the VIN number on a ticket. And when Mr. Simon offered his registration to the first officer, he said, no, I don't need that. Thank you very much. So she wasn't checking the VIN number of the registration because they had refused to take it from her. So. On the stop sign. Yes. I recognize there's testimony in the transcript about capacity or sensitivity to being able to see it in the night versus the daylight. That's right. Is there a direct statement by the officer that there was a stop sign? I think on cross-examination, what I said was, can you see the stop sign in that photo? And she said, no. But then on redirect, the government asked, can you see it when, not in a photo, you can't see in the photo, but can you see it when you're on the street? And she said, yes, I can see the stop signs when I'm on the street. So that is what she said. And also, she has excellent night vision. Thank you. Thank you. Thank you, Ms. Walters. Thank you, Ms. Pollard. The case is taken under advisement.